IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL GUY KECKLER,          :
          Plaintiff,          :          NO. 4:15-cv-02462
                              :
     v.                       :
                              :          (Brann, J.)
COMMISSIONER OF               :          (Saporito, M.J.)
SOCIAL SECURITY,              :
          Defendant.          :

## REPORT AND RECOMMENDATION

This is an action brought under 42 U.S.C. §405(g), seeking judicial review of the Commissioner of Social Security's ("Commissioner's") final decision denying Michael Guy Keckler's ("Keckler's") application for Disability Insurance Benefits under Title II of the Social Security Act. This matter has been referred to the undersigned Magistrate Judge for the preparation of the report and recommended disposition pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.

For the reasons stated herein, we recommend that the final decision of the Commissioner denying Keckler's application for benefits be affirmed, and that Keckler's request for relief be denied.

I.  <u>Background and Procedural History</u>:

Keckler is a high school educated adult whose past relevant work includes the occupations of materials handler, color printer operator, industrial cleaner, and fork lift operator.  There is no dispute that these jobs are either performed at an exertion level that exceeded Keckler's abilities during the relevant period or required a higher degree of skill than Keckler could perform secondary to his other limitations.

Contemporaneous medical records reflect that Keckler was taking prescribed pain medications for several conditions including back pain, and had a past surgical history of a right shoulder arthroscopy, back surgery, open treatment of a vertebral fracture, and hip surgery.  On November 28, 2012, Keckler protectively filed a Title II application for disability benefits alleging that he became unable to work on October 1, 2012, due to the conditions of back injury L1, lower spinal fusion, degenerative disc disease, right total hip replacement, left total hip replacement, gout, and anxiety attacks.  He alleges that these conditions affect his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, complete tasks, and get along with others.  (Admin. Tr. 168).  He asserts that he cannot walk more than fifty yards at one time.  Id.  He reported

that he spends an average of six hours per day sitting in his recliner to alleviate his back pain, and typically walks one quarter-mile per day for exercise. (Admin. Tr. 45, 46). Keckler testified that, in his opinion, he could not work because of his back. (Admin. Tr. 53). His wife confirmed this limitation, and specified that Keckler's treating physician, Dr. Wampler, recommended that Keckler should not lift more than forty pounds.[1] (Admin. Tr. 159).

Keckler's claims were denied at the initial level of administrative review on March 21, 2013. Keckler requested further review, and was granted an opportunity to appear and testify before Administrative Law Judge Patrick S. Cutter (the "ALJ"). Keckler was assisted by counsel throughout the proceedings. Impartial vocational expert Mitchell Schmidt ("VE Schmidt") also appeared and testified during the proceedings. The ALJ denied Keckler's claim in a written decision dated August 15, 2014. Keckler sought further review from the Appeals Council of the Office of

---

[1]This limitation is not specified in Dr. Wampler's treatment notes. Moreover, the portion of Dr. Wampler's 2012 RFC questionnaire that addressed Keckler's ability to lift or carry objects is not included in the record before us, and was presumably not included in the record before the ALJ. However, in February 2014, Dr. Wampler assessed that Keckler could not lift or carry more than ten pounds.

Disability Adjudication and Review, but his request was denied on October 30, 2015. This denial makes the ALJ's 2014 decision the final decision of the Commissioner denying Keckler's claim.

On December 22, 2015, Keckler initiated this action by filing a complaint in federal court. (Doc. 1). Keckler seeks a judgment for such relief as may be proper. Id. On February 24, 2016, the Commissioner filed her answer, in which she maintains that the ALJ's decision is correct, in accordance with the law regulations, and is based on findings of fact that are supported by substantial evidence. (Doc. 12). Together with her answer, the Commissioner filed a certified transcript of the administrative proceedings in this case. (Doc. 13).

This matter has been fully briefed by the parties and is ripe for decision. (Docs. 14, 15). We begin our analysis of the issues before us by reviewing the pertinent medical evidence of record.

In March 2011, Keckler reported that his pack pain was controlled with use of a Fentanyl transdermal patch, but that the patch frequently fell off while he was working. To address this concern, the Fentanyl patch was discontinued and Keckler's dosage of Oxycontin was increased from 20mg every twelve hours to 40mg every twelve hours. (Admin. Tr. 327-

4

28).

On August 2, 2011, Keckler presented to his primary care physician, David Wampler ("Dr. Wampler"), with complaints of left ankle pain. Due to this increased pain, Keckler reported that he had been using between three and four of his 40mg Oxycontin pills daily to control his pain. (Admin. Tr. 333). On August 8, 2011, Keckler reported that his employer was critical of Keckler's use of prescribed narcotic pain medications after a random drug screening. (Admin. Tr. 336). During the examination it was noted that Keckler needed a second opinion for FMLA papers, and that Dr. Wampler informed Keckler's employer that Keckler was taking narcotic pain relievers under Dr. Wampler's care. Id. On August 18, 2011, treatment records reflect that Keckler was approved to return to full-time regular duty work on August 23, 2011. (Admin. Tr. 338). Subsequent records, however, reflect that Keckler continued to have difficulty with his ankle secondary to Gout. (Admin. Tr. 341). Keckler missed one day of work as a result of this condition. Id.

In October 2011, Keckler missed three days of work secondary to an upper respiratory infection. (Admin. Tr. 344). Keckler's dosage of Oxycontin was temporarily increased by Dr. Wampler from 40mg every

twelve hours to 80mg every twelve hours in response to Keckler's complains of rib pain secondary to coughing. (Admin. Tr. 344).

In December 2011, Keckler had another episode of Gout, which resulted in another day of missed work. (Admin. Tr. 347). During this visit, Keckler admitted to Dr. Wampler that he took the 80mg and 40mg dosages of Oxycontin on the same days recently. Id. His dosage of Oxycontin was reduced from 80mg every twelve hours to 40mg every twelve hours. Id. Keckler also reported increased difficulty walking on his left foot. Id. An x-ray revealed mild osteoarthritis, mild soft tissue swelling, and small calcaneal spurs. (Admin. Tr. 349).

In January 2012, Keckler missed approximately fourteen days of work due to a painful sebaceous cyst on his chest that became infected after it was lanced. (Admin. Tr. 350-52). Keckler was approved to return to work with no restriction on January 21, 2012. (Admin. Tr. 354).

In April 2012, Keckler reported to Dr. Wampler that he was having increased anxiety, was taking a larger dosage of his anxiety medication than was prescribed, and had run out two weeks prior to his appointment. (Admin. Tr. 356). Keckler also reported that he ran out of Oxycontin prematurely because he was taking extra during a stomach illness. Id.

Keckler was prescribed a new type of medication for his anxiety, and his prescription of Oxycontin was renewed at the same dosage.  Id.

On April 8, 2012, five days after he was examined by Dr. Wampler, Keckler was hospitalized for acute renal failure secondary to substance abuse.  Keckler remained in the hospital for inpatient treatment until April 19, 2012.  Keckler was diagnosed with pneumonia, septic shock, narcotic dependence, benzodiazepine addiction, acute renal failure, and alcoholism.  Keckler agreed to no longer use any benzodiazepine, and was discharged without pain medication.  (Admin. Tr. 219).  On discharge, Keckler was instructed to resume normal activities as tolerated, but to avoid heavy lifting and strenuous exercise, but was instructed not to resume driving without medical approval.  (Admin. Tr. 216).

On April 23, 2012, four days after he was discharged from the hospital, Keckler was examined by Dr. Wampler.  Keckler reported that he was much improved but still suffered from chronic pain.  (Admin. Tr. 359).  He requested that his pain medications be restarted.  Id.  Keckler was prescribed Oxycontin, and was instructed to take 40mg every twelve hours.  (Admin. Tr. 359).

On May 7, 2012, Dr. Wampler completed a physical RFC questionnaire.[2]  (Admin. Tr. 422-23).  In the 2012 questionnaire, Dr. Wampler reported that he had treated Keckler since 2008, and examined him once every three months.  He reported Keckler's current diagnoses as back pain with fractures L1 spinal fusion, bilateral hip replacement due to aseptic necrosis, chronic pain, anxiety, hypertension, hyperlipidemia, and gout.  He reported that Keckler's pain was in his shoulders, back, and hips, and that Keckler suffered from acute episodes of panic and anxiety.  Dr. Wampler reported that the following clinical findings support his diagnoses: tender back and hip, unable to bend or squat, and x-rays show degenerative changes in back and hips.  He reported that Keckler has had multiple surgeries, needed to take narcotics to work, and needed tranquilizers for anxiety.  Dr. Wampler assessed that Keckler: could never stoop, crouch, or climb ladders; could rarely twist or climb stairs; had

_____

[2]The 2012 questionnaire appears to be on the same form as a questionnaire completed by Dr. Wampler in 2014, except that the copy of the 2012 questionnaire included in the record before the ALJ was missing two pages.  The 2012 questionnaire is missing Dr. Wampler's responses to questions nine through fifteen. Additionally, this questionnaire was completed several months before Keckler's alleged onset date, while Keckler was still employed.

significant limitations with reaching, handling and fingering but no loss of functioning of his hands, fingers, or arms; and could be expected to be absent more than four days per month due to his impairments.

In June 2012, Keckler experienced a gout flare-up resulting in bilateral ankle pain. (Admin. Tr. 365).

In August 2012, Keckler reported that his prescribed medication helped him maintain functional status for back pain. (Admin. Tr. 369). He also reported that he experienced right hip pain that was being addressed with an orthopedist. (Admin. Tr. 370).

In September 2012, Keckler's dosage of Oxycontin was reduced from 40mg every twelve hours to 30mg every twelve at Keckler's request. (Admin. Tr. 372). Keckler was instructed to cut back on heavy lifting at work. Id. Keckler gradually tapered off Oxycontin until he was taking no prescribed pain medication in late September 2012. (Admin. Tr. 376). However, Keckler reported that his home life was stressful. Id. He was noted to be anxious on mental status examination. (Admin. Tr. 378).

On October 1, 2012, Keckler was terminated by his employer. (Admin. Tr. 433). In October 2012, records reflect that Keckler was prescribed a type of nonsteroidal anti-inflammatory medication and a gout

medication to control his pain.  He reported that these medications were not effective, and that his anxiety had worsened and was no longer under control.  (Admin. Tr. 379-380).

In November 2012, Keckler reported that his anxiety was under control.  (Admin. Tr. 384).  In January 2013, Keckler reported that he could lift up to forty pounds.  (Admin. Tr. 163).  In February 2013, Keckler was examined by consultative medical examiner Shruti P. Dhorajia ("Dr. Dhorajia") and consultative psychologist Anthony Fischetto ("Dr. Fischetto").

Dr. Dhorajia noted on examination that Keckler was favoring his right leg, and reported a recent gout attack.  Dr. Dhorajia assessed that Keckler could: lift and carry forty pounds; stand and walk between thirty and forty minutes, and sit for eight hours if permitted to alternate between sitting and standing at will; and occasionally bend, kneel, stoop, crouch, balance, and climb, but need to hold on to something.  Dr. Dhorajia also assessed that Keckler had a limited capacity to push or pull with his lower extremities secondary to back and leg pain, and limited capacity to reach with his upper extremities secondary to back pain.  He also noted that Keckler had a full range of motion in his hips, and only a

slightly reduced range of motion in his lumbar spine.  (Admin. Tr. 399-417).

During his examination with Dr. Fischetto, Keckler reported that he has "high anxiety" that had been getting worse over the past five or six years, a history of alcohol dependence resulting in one period of hospitalization, that he was recently started on Lorazepam (a benzodiazepine) for anxiety but had never taken prescribed medication, that he had a history of difficulty getting along with others and difficulty focusing and paying attention, and that he could not work now because he gets panic attacks when he leaves his home.  (Admin. Tr. 389-397).  On mental status examination, Keckler was slow at serial sevens, but had an intact memory, and good immediate retention and recall.  Keckler's impulse control and social judgment was noted to be poor secondary to his history of drug and alcohol abuse.  Dr. Fischetto diagnosed alcohol dependence in early partial remission, polysubstance dependence in full remission, attention deficit hyperactivity disorder ("ADHD"), panic disorder with agoraphobia, depressive disorder, and personality disorder. Dr. Fischetto assessed that Keckler was not competent to manage personal funds in a competent manner.  He opined that Keckler would

have the following limitations as a result of his mental impairments: extreme difficulty making judgments on simple work-related decisions; marked difficulty responding appropriately to changes in a routine work setting; moderate difficulty understanding, remembering, and carrying out detailed instructions; moderate difficulty interacting with the public, supervisors, and co-workers; moderate difficulty responding appropriately to changes in a routine work setting; and slight difficulty understanding, remembering, and carrying out short, simple instructions. Dr. Fischetto explained that these limitations were the result of Keckler's history of drug and alcohol dependence, ADHD, behavioral problems, panic attacks, and complaints of agoraphobia.

As part of the initial administrative review of Keckler's claims, State agency psychologist Henry Weeks ("Dr. Weeks") completed a psychiatric review technique  form ("PRTF"), and a mental residual functional capacity ("RFC") assessment based on the records available on or before March 7, 2013. In his PRTF, Dr. Weeks noted that Keckler had medically determinable mental impairments that did not precisely satisfy the paragraph A criteria of listings 12.02 (organic mental disorders), 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.08 (personality

disorders), or 12.09 (substance addiction disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 67). Dr. Weeks assessed that these disorders resulted in a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation of extended duration. Id. In his RFC assessment Dr. Weeks assessed that Keckler had no understanding and memory limitations beyond those that result from Keckler's physical pain, and moderate limitation to his ability to interact with the public and get along with others secondary to anxiety. (Admin. Tr. 70-71). Dr. Weeks concluded that Keckler would be capable of carrying out simple, routine tasks that do not aggravate his physical conditions. Id.

In May 2013, Keckler requested extra Alprazolam tablets to treat his anxiety during doctors' appointments and social gatherings. (Admin. Tr. 433). Keckler admitted to Dr. Wampler that he takes a few extra Alprazolam pills in certain situations. (Admin. Tr. 434). Keckler reported that his pain is somewhat controlled, but that it was continuously present and ranges from mild to severe. (Admin. Tr. 434). On examination, Keckler had a tender right hip, and was unable to bend and touch his toes

or squat.  (Admin. Tr. 436).  The results from an ultrasound revealed a small avascular effusion.  (Admin. Tr. 465).

In August 2013, Keckler reported that his anxiety level was high, but that his medication is helpful.  (Admin. Tr. 437).  His dosage was increased from a maximum of three tablets per day to four tablets per day as needed.  (Admin. Tr. 439).  Keckler was anxious on mental status examination.  (Admin. Tr. 440).  Keckler also noted that he may need another hip replacement because his back has been hurting and his right leg was numb.  (Admin. Tr. 438).  He also reported some ankle pain from gout.  Id.

In November 2013, Keckler reported increased anxiety, and walked with a broad-based gait.  (Admin. Tr. 442, 444).

In February 2014, Keckler reported increased anxiety secondary to financial stressors, his dosage Alprazolam was increased to a maximum of six tablets per day as needed.  (Admin. Tr. 445).

On February 20, 2014, Dr. Wampler completed a second physical RFC questionnaire. Dr. Wampler reported that he has treated Keckler for approximately sixteen years, and sees Keckler once every three months.  (Admin. Tr. 424-27).   Keckler's current diagnoses were adult onset

diabetes, aseptic necrosis of the hips causing pain, back pain, anxiety, hyperlipidemia, and gout. Dr. Wampler reported that Keckler's pain was worse with activity and better with rest, and that Keckler has gout attacks without warning or cause. Dr. Wampler also noted that Keckler has the symptoms of anxiety, blurred vision, dizziness, insomnia, and joint pain. He identified the objective signs supporting his diagnoses as antalgic gait, decreased range of motion of the spine, and anxious mental status. Dr. Wampler assessed that, as a result of his physical impairments Keckler: could sit no more than fifteen minutes at one time or for more than two hours per workday; could stand for no more than ten minutes at one time or for more than two hours per workday; would need to get up and take unscheduled walking breaks lasting ten minutes in duration every fifteen minutes; must be permitted to shift positions at will from sitting, standing or walking; must use a cane for ambulation; could rarely lift or carry ten pounds; occasionally lift or carry less than ten pounds; could never climb ladders; could rarely look down (sustained flexion of the neck), look up, hold his head in a static position, twist, stoop, crouch, or climb stairs; could occasionally turn his head right or left; could use his fingers for fine manipulation for 50% of the workday; and could

use his hands to grasp, turn, and twist objects for 10% of the workday; could use his arms to reach for 5% of the workday.  Dr. Wampler also assessed that Keckler's ability to function was eroded by symptoms resulting from depression and anxiety.  He opined that Keckler's symptoms would constantly interfere with his ability to maintain the attention and concentration necessary to perform simple tasks, Keckler would be incapable of handling even "low stress" jobs, and that Keckler would be absent for more than four days per month secondary to his impairments.

In March 2014, Keckler reported that his back pain became more severe.  He began using a cane regularly for support.  (Admin. Tr. 451).  It was noted that his back was tender to palpation but that he had a full range of motion to flexion and hyperextension.   (Admin. Tr. 454).  Diagnostic imaging of Keckler's thoracic spine showed no significant abnormality, and Keckler's pain was attributed to a known deformity at L1 not visible on thoracic x-ray.  (Admin. Tr. 463).  He reported that his anxiety was controlled despite feeling stressed. (Admin. Tr. 452).  In April 2014, Keckler underwent a revision to his 2010 bilateral hip replacement surgery after more conservative measures failed to relieve his pain.

(Admin. Tr. 475-478).  No records regarding Keckler's recovery, or post-surgical improvement, were included in the record before the ALJ.  At his administrative hearing, however, Keckler reported that the revision surgery helped "as far as pivoting" but that he still has hip pain at least once or twice a week lasting up to two days in duration.  (Admin. Tr. 43).

II.   STANDARD OF REVIEW:

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a).  In addition, to receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she

17

was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.  20 C.F.R. §404.1520(a)(4).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC.  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R.

§404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  But in an adequately developed factual record, substantial evidence may be "something less than the

weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Keckler is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

III.   THE ALJ'S DECISION DENYING KECKLER'S APPLICATION FOR BENEFITS:

In his August 2014 decision denying Keckler's application for benefits, the ALJ evaluated Keckler's claims at each step of the sequential evaluation process.   The ALJ also assessed that Keckler met the insured status requirement of Title II of the Social Security Act through December 31, 2017.

At step one the ALJ found that Keckler did not engage in substantial gainful activity between October 1, 2012, and August 15, 2014 (hereinafter "the relevant period").   At step two, the ALJ found that Keckler had the following medically determinable severe impairments during the relevant period: degenerative changes to both hips, status-post bilateral hip replacements prior to the claimant's alleged onset date, degenerative disc disease of the lumbar spine, obesity, and anxiety.   The ALJ also found that the following medically determinable non-severe impairments existed during the relevant period: gout, hypertension, and polysubstance abuse in current remission.   At step three, the ALJ found that Keckler did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

1 during the relevant period.

Between steps three and four, the ALJ assessed Keckler's RFC.  He found that, during the relevant period, Keckler had the RFC to perform light work as defined by 20 C.F.R. §404.1567(b) except that Keckler was:

> limited to jobs that can be performed in either a sitting or standing position, he can occasionally balance and stoop, he should never climb ladders, ramps, scaffolds, ropes, or stairs, he should never crouch, crawl, or kneel, and he should avoid concentrated exposure to temperature extremes and high humidity.  He is limited to routine repetitive one to two step type tasks with no more than occasional changes, decision making, or interaction with the public, supervisors, and coworkers.

(Admin. Tr. 27).

At steps four and five of the sequential evaluation process, the ALJ relied on the above RFC assessment, and on the testimony of VE Schmidt. VE Schmidt testified that Keckler's past relevant work as a material handler, color printer operator, industrial cleaner, and fork lift operator could not be performed by an individual with the RFC listed above. (Admin. Tr. 56-57).  The ALJ relied on VE Schmidt's testimony to support his conclusion that Keckler could not engage in any of his past relevant work at step four.  VE Schmidt also testified that an individual with the RFC listed above, and with the same other vocational characteristics of

Keckler, could engage in the following occupations: garment sorter (DOT #222.687-014); paper-pattern folder (DOT #794.687-034); and, fruit cutter (DOT #527-687-066).   The ALJ relied on VE Schmidt's testimony to support his conclusion that, during the relevant period, Keckler could engage in other work that exists in the national economy.

IV.   DISCUSSION:

In his decision, the ALJ accorded "limited" weight to Dr. Wampler's May 2012 and February 2014 physical RFC questionnaires.   The ALJ explained that the questionnaires:

> are inconsistent with [Dr. Wampler's] treatment notes, which note some problems, but a positive response to medications, and when examined, fairly normal physical examination findings.  Given he only treated the claimant's anxiety with medication, he did not refer the claimant to a mental health specialist, and the claimant's pain was present but not unbearable until March 2014, these opinions are inconsistent with the rest of the record, including Dr. Wampler's treatment records, such as a note by Dr. Wampler in October 2012 that the claimant should keep looking for work that was not as strenuous after he was laid off from his job in October 2012 (Exhibit 3F/57).

(Admin. Tr. 30).  Instead, the ALJ assigned "great" weight to a competing opinion by nontreating source Dr. Dhorajia, because he found that Dr. Dhorajia's opinion was adequately supported by and consistent with the

record.  The ALJ did, however, find that Keckler was more restricted in lifting and carrying that was assessed by Dr. Dhorajia.  (Admin. Tr. 29-30).

The Commissioner's regulations provide that, when an ALJ does not give controlling weight to the medical opinion of a treating acceptable medical source, he or she must consider several factors in deciding how much weight to accord to the non-controlling treating acceptable medical source opinion.  20 C.F.R. §404.1527(c)(2).  These factors include, but are not limited to: the length of time the claimant has sought treatment from the medical source, and the frequency with which the claimant was examined by the source; the nature of the treatment relationship (e.g., the kinds of treatment provided, and testing that was conducted or ordered from specialists); the extent to which the source has presented relevant evidence to support his or her opinion; the extent to which the source's opinion is consistent with the record as a whole; and, whether the source is a specialist in the medical conditions at issue.  Id.  The Commissioner must give "good reasons" for the weight given to a treating acceptable medical source's opinion.  Id.  The Third Circuit has underscored the importance of this explanation by elaborating the ALJ must provide "a

clear and satisfactory explication of the basis on which" his or her decision rests.   Cotter, 642 F.2d at 704-05.   The underlying rationale for this requirement is to facilitate this Court's discharge of its obligation to conduct meaningful judicial review pursuant to 42 U.S.C. §405(g). Nonetheless, reviewing Courts must also be cognizant that "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them."  Cotter, 642 F.2d at 705.

In his brief, Keckler argues that the ALJ rationale for "rejecting" the opinions from Dr. Wampler's 2012 and 2014 physical impairment questionnaires are contrary to the law and are not supported by substantial evidence.

First, Keckler argues that the ALJ failed to accord appropriate deference and consideration to the fact that Dr. Wampler was a treating source.  The Commissioner's regulations categorize medical sources based on the nature of their relationship with the claimant.  A "treating source," like Dr. Wampler, is an acceptable medical source who provides or has provided the claimant with medical treatment or evaluation and who has or has had an ongoing treatment relationship with the claimant.   20 C.F.R. §404.1502.   A "nontreating source," like Dr. Dhorajia, is an

acceptable medical source who has examined the claimant but does not have, or did not have, an ongoing treatment relationship with the claimant.  Id.  Keckler is correct that the Commissioner's regulations provide that "generally" more weight should be accorded to opinions of treating sources than to nontreating sources like Dr. Dhorajia.  20 C.F.R. §404.1527(c)(2).  However, the mere fact that a source is a treating source, without more, does not prohibit the ALJ from giving greater deference to the opinion of a nontreating source where the opinion of the nontreating source is more well-supported and more consistent with the record.  See 20 C.F.R. §404.1527(c)(2); SSR 96-2p, 1996 WL 374188 (explaining that a treating source's opinion is not controlling unless it is well-supported, and is "not inconsistent" with other substantial evidence of record).  The ALJ's decision reflects that he was aware that Dr. Wampler was a treating source.  Further, Keckler has failed to explain why he believes the ALJ's consideration of this factor is insufficient, except for the fact that he disagrees with the ALJ's assessment that Dr. Wampler's RFC questionnaires are entitled to "little" weight.  As such, we find that Keckler's allegation that Dr. Wampler's opinion is entitled to greater weight only because he is a treating source lacks merit.

Next, Keckler criticizes the ALJ's reliance on 20 C.F.R. §404.1527(c)(3) as a basis to discount Dr. Wampler's 2012 and 2014 physical RFC questionnaires.   20 C.F.R. §404.1527(c)(3) provides, in relevant part, that:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.

To the extent that Keckler objects to the ALJ's reliance on 20 C.F.R. §404.1527(c)(3) to weigh Dr. Wampler's opinions, we find that Keckler's argument lacks merit.  The regulations provide that the ALJ should apply this factor, among others, to determine the weight given to a non-controlling treating source opinion.

Next, Keckler suggests that the ALJ's explanation for discounting this opinion is not supported by the record.  In support of this allegation, Keckler cites the clinical findings noted on each questionnaire, the fact that Dr. Wampler prescribed pain medications, and provided excused work absences.  We also find that this argument lacks merit.  Although Keckler is correct that Dr. Wampler cites to "x-rays/MRI" that "show degenerative changes [in Keckler's] back and hips," an MRI or X-ray does

not correlate with a specific degree of functional limitation or level of pain. (Admin. Tr. 422).  Furthermore, the record reflects that Keckler stopped taking prescribed pain medications before his alleged onset date. Similarly, Dr. Wampler provided excused absences for a few days or weeks before Keckler alleged onset date relating to specific, and short-lived, ailments.  As such, we find that this evidence does not provide a sufficient basis to disturb the ALJ's decision to discount Dr. Wampler's opinion.

Last, Keckler argues that "[t]he ALJ[sic] analysis of the opinions[sic] of Dr. Wampler's opinion depends on his lay interpretation of Dr. Shah's notes, ignoring the numerous §404.1527 factors . . . ." (Doc. 14 p. 14).  We similarly find that this argument lacks merit.  There is no record that a source named Dr. Shah submitted any notes in this case, or ever examined Keckler.  In fact, the majority of the notes in this case were from Dr. Wampler, and did not provide a detailed account of Keckler's symptoms. It is this lack of support, combined with the detailed objective records offered by Dr. Dhorajia that ultimately informed the ALJ's decision in this case.

V.    <u>RECOMMENDATION</u>:

Accordingly, because we find that the ALJ's decision is supported by substantial evidence, IT IS RECOMMENDED that:

1.    Michael Guy Keckler's request for relief should be DENIED, and  the Commissioner's final decision denying Michael Guy Keckler's application for benefits under Title II and XVI of the Social Security Act should be AFFIRMED;

2.    Final judgment should be entered in favor of the Commissioner and against Michael Guy Keckler; and,

3.    The Clerk of Court should be directed to close this case.


<u>s/ Joseph F. Saporito, Jr.</u>
JOSEPH F. SAPORITO, JR.
U.S. Magistrate Judge

Dated: January 17, 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL GUY KECKLER,          :
                 Plaintiff,   :        NO. 4:15-cv-02462
                              :
        v.                    :
                              :        (Brann, J.)
COMMISSIONER OF               :        (Saporito, M.J.)
SOCIAL SECURITY,              :
                 Defendant.   :

## NOTICE

Notice is hereby given that the undersigned has entered the

foregoing Report and Recommendation dated January 17, 2017.  Any

party may obtain a review of this Report and Recommendation pursuant

to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter
> described in 28 U.S.C. § 636 (b)(1)(B) or making a
> recommendation for the disposition of a prisoner case or a
> habeas corpus petition within fourteen (14) days after being
> served with a copy thereof. Such party shall file with the clerk
> of court, and serve on the magistrate judge and all parties,
> written objections which shall specifically identify the portions
> of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections. The briefing
> requirements set forth in Local Rule 72.2 shall apply. A judge
> shall make a de novo determination of those portions of the
> report or specified  proposed findings or recommendations to
> which objection is made and may accept, reject, or modify, in
> whole or in part, the findings or recommendations made by the

magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

<u>s/ Joseph F. Saporito, Jr.</u>
JOSEPH F. SAPORITO, JR.
U.S. Magistrate Judge

Dated: January 17, 2017